**CCB OHIO LLC, et al., Plaintiffs,**

v.

**CHEMQUE, INC., Defendant.**

**No. 1:07–CV–00541.**

United States District Court,
S.D. Ohio,
Western Division.

Aug. 12, 2009.

---

James Eugene Burke, Warren Jeffrey Sefton, William Alan Posey, Keating, Muething & Klekamp, Cincinnati, OH, for Plaintiffs.

Lauren Brill, Mark C. Melko, William B. Benson, Wiles, Boyle, Burkholder & Bringardner Co., LPA, Columbus, OH, for Defendant.

## OPINION AND ORDER

S. ARTHUR SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 46), Plaintiffs' Response in Opposition (doc. 62), and Defendant's Reply (doc. 65). Also before the Court is Plaintiffs' Motion for Partial Summary Judgment (doc. 52), Defendant's Response (doc. 59), and Plaintiffs' Reply (doc. 70); as well as Plaintiffs' Motion to Strike (doc. 69), Defendant's Response in Opposition (doc. 72), and Plaintiffs' Reply (doc. 74). The Court held a hearing on all such motions on July 16, 2009. For the reasons indicated herein, the Court GRANTS IN PART Defendant's Motion to the extent that it DISMISSES Count 10 of Plaintiffs' Complaint, but DENIES the balance of such motion, as well as the other pending motions.

## I. Background

Plaintiffs (CURRENT Group, LLC, Current Technologies, LLC, CCB Ohio LLC, and Current Communications, LLC) (hereinafter, collectively, "CCB") are in the business of enabling integrated broadband over power line, a technology that permits electric companies to monitor their grids as well as allowing for broadband communications services through existing electrical wires (doc. 26). Defendant Chemque, Inc., ("Chemque") manufactures chemical products, including "Q-Tel" gel, the product at issue in this case [1] (*Id.*). Plaintiffs allege that Defendant sold them Q-Tel gel for use in sealing couplers on outdoor electric lines, but that the gel failed to solidify as Defendants had indicated it would, but rather reverted to liquid, leaked out, and caused property damage (*Id.*).

### A. History of the Parties' Interaction

The facts as supported by the briefing are as follows. Plaintiffs' subconcontractor, Joslyn Manufacturing, Inc., ("Joslyn"), initiated contact with Defendant in 2003, seeking a product to serve to encapsulate coupler units connecting medium voltage electrical wires (doc. 62). In response, Defendant sent information stating its Q-Tel product would form "a strong moisture impermeable barrier" (*Id.*). According to Plaintiffs, Plaintiffs' engineer, Joe Roesch, and Defendant further communicated about the proposed use for the gel, including that the device to be sealed was going to be outdoors, in the sun, hanging on

---

1. The Court notes that the parties' briefing refers to both "Q–Tel" gel and "Q-gel," which are technically comprised of the same components, but mixed at different ratios (doc. 52, fn. 2). For the purposes of this motion the Court will use the terms interchangeably.

utility poles, and in a marine type-environment with humidity and salt (*Id.*). Defendant takes the position that Plaintiffs failed to share any of this information, and that its data sheet for the product indicates its use is for encapsulating buried cable splices (doc. 59). According to Plaintiffs, Defendant played an active role in the selection of and recommendation of their Q–Tel 2031 product for use in the Plaintiffs' couplers (doc. 62). Plaintiffs purchased a quantity of Q–Tel product directly from Defendant to perform initial testing, which it completed to its satisfaction (*Id.*). Defendants ultimately would critique the testing Plaintiffs performed, as Joe Roesch did not replicate testing of the product beyond mixing it in styrofoam cups and putting it on his windowsill (doc. 59).

Plaintiffs used their subcontractors, Joslyn, Cheasapeake Manufacturing, and Celestia, to install its couplers, sealed with Defendant's product, which the subcontractors purchased directly from Defendant (doc. 62). Plaintiffs contend that at no time during the recommendation or use of the Q–Tel product did Defendant ever represent to Plaintiffs or their subcontractors that the Q–Tel product or the mixers utilized were not suitable for use in the intended application (*Id.*).

In mid-August 2005, Plaintiffs received a report of active leaking from a coupler (*Id.*). Ultimately, Plaintiffs found evidence that approximately 40% of the couplers were leaking (*Id.*). Following meetings between the Plaintiffs and Defendant, Defendant concluded that improper mixing caused the Q–Tel gel to fail to set properly, and suggested Plaintiffs should wipe the Q–Tel from the affected couplers and replace it with new Q–Tel (*Id.*). Plaintiffs evaluated a number of different proposals and ultimately decided to wrap the couplers with shrink wrap to contain the leaking, an effort which was unsuccessful (*Id.*).

As of today, Plaintiffs allege approximately 90% of the couplers are leaking, causing new damage to property owners, and resulting in a demand from Duke Energy Corporation that Plaintiffs remove the Q–Tel product from its greater Cincinnati area network (*Id.*).

## B. Procedural History

Plaintiffs filed their initial Complaint on July 16, 2007, and amended it on January 29, 2009 (doc. 26). Plaintiffs bring claims of (Count 1) breach of express warranty, (Count 2) breach of implied warranty of merchantability, (Count 3)breach of implied warranty of fitness for a particular purpose, (Count 4) breach of express and implied warranty, third-party beneficiary, (Count 5) strict liability for defective manufacture or formulation, (Count 6) strict liability for defective design, (Count 7) strict liability for failure to warn, (Count 8) strict liability for failure to conform to representation, (Count 9) supplier liability, (Count 10) negligence, (Count 11) fraud/fraudulent inducement, (Count 12) negligent misrepresentation, and (Count 13) punitive damages (*Id.*).

Defendant argues the Court should grant summary judgment to it under a whole host of theories, including that six of Plaintiffs' claims are barred under Ohio law, that Plaintiffs fail to assert a product liability claim, that Plaintiffs' claims are all barred by the statute of limitations, Plaintiffs' breach of warranty claims fail for lack of privity and disclaimer, and seven of Plaintiffs' claims are barred by the economic loss doctrine (doc. 46). Plaintiffs argue Defendants' theories are wrong, that it filed its action within the statute of limitations, that it is in privity with Defendant, and the economic loss doctrine does not apply (doc. 62). Moreover, Plaintiffs bring their own motion for partial summary judgment, arguing that Defendant

has proffered no expert testimony to counter their evidence supporting their eighth claim for relief, for strict liability based on failure to conform to a representation, such that Plaintiffs should prevail on such claim as a matter of law (doc. 52). Finally, Plaintiffs argue the Court should strike the affidavit of Mr. Sam Ghaly, Chemque's president, filed in Response to Plaintiffs' Motion for Summary Judgment, as irrelevant, immaterial and/or inadmissible (doc. 69).

## II. The Summary Judgment Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *see also, e.g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.,* 979 F.2d 1131, 1133 (6th Cir.1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993), *quoting in part Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also LaPointe,* 8 F.3d at 378; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1389 (6th Cir.1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. *See Celotex,* 477 U.S. 317, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the "requirement [of the Rule] is that there be no genuine issue of *material* fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added); *see generally Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *see also Gregory v. Hunt,* 24 F.3d 781, 784 (6th Cir.1994). Accordingly, the non-movant must present "significant probative evidence" demon-

strating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir.1993); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Guarino*, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." *Guarino*, 980 F.2d at 405, *quoting Inter-Royal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. *See Guarino*, 980 F.2d at 410; *Car-*

*ver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir.1991).

## III. Discussion: The Parties' Arguments on Defendants' Motion

At the July 19, 2009 hearing, Defendant focused its arguments on three of its theories: that there is a lack of privity between it and Plaintiffs; that the Ohio Product Liability Act abrogates Plaintiffs' causes of action; and that the economic loss doctrine applies thus barring recovery. Plaintiffs responded, as well as arguing in support of their motion for partial summary judgment, which the Court will address in Section IV, below. The Court will address the parties' arguments at the hearing in tandem with those arguments the parties raised in their briefing.

### A. Privity

Defendant first argued at the hearing that there was never a contract between Plaintiffs and the Defendant, as Plaintiffs used subcontractors that bought the Q–Tel product from Defendant, so that Plaintiffs' breach of warranty claims are barred by a lack of privity. Defendant argued if Plaintiffs should have sued anyone, they should have sued their subcontractors. Plaintiffs responded at the hearing that they had a direct relationship with Defendant, as evidenced by an email from Sam Ghaly, stating he considered Plaintiffs a customer.

In their briefing, Plaintiffs argue they are in privity of contract with Defendant because they did purchase some of the gel product directly from Defendant, and in any event, Defendant knew who was the principal customer of the product (doc. 62). In the event the Court would find Defendant's "hypertechnical assertion" correct, Plaintiffs argue Ohio case law permits a plaintiff to establish privity even in the absence of a direct contractual relationship, where 1) an agency relationship ex-

ists, and 2) where the plaintiff is a third-party beneficiary to a contract (*Id.*). Here, Plaintiffs argue, they are in privity of contract with Defendant because Plaintiffs' subcontractors acted as Plaintiffs' agents, and because Plaintiffs are an intended third-party beneficiary to the contract (*Id.*).

 Having reviewed this matter, the Court finds Plaintiffs' position well-taken. There are clearly factual issues in question as to whether the Plaintiffs and Defendant had a direct relationship. However, there is no genuine dispute that Plaintiffs' contractors acted as Plaintiffs' agents in purchasing from Defendant, such that privity exists between Plaintiffs and Defendant as a matter of law.

### B. The Ohio law issue: Abrogation

Defendant argues that under applicable Ohio law, the bulk of Plaintiffs' claims (Counts 1–4 and 10–12) fail, as the Ohio Product Liability Act, ("OPLA") O.R.C. § 2307.71, abrogated all common law product liability causes of action (doc. 46). Plaintiffs respond that its claims are unaffected by the OPLA, as the abrogation in question is much narrower than Defendant's interpretation (doc. 62). According to Plaintiffs, when the Ohio Legislature enacted the OPLA, it did so in order to eliminate parallel product liability common law causes of action, so as to ensure all product liability claims would be governed by state statutory provisions (*Id.*). However, contend Plaintiffs, the legislature's action did not eliminate claims premised on the UCC, like its claims for breach of warranty (*Id.*) citing *Miles v. Raymond Corp.*, 612 F.Supp.2d 913, 922–25 (N.D.Ohio 2009)). Similarly, argue Plaintiffs, their claims for fraud/fraudulent inducement and negligent misrepresentation are not "common law product liability claims" and should survive Defendant's motion (*Id.*). Defendant replies that Plaintiffs fail to address abrogation of their negligence claim, and that case law in this district and in the Ohio court of appeals shows that breach of warranty claims are abrogated by the OPLA (*Id.*) citing *Deacon v. Apotex Corp.*, Case No. 3:07–CV–00322, 2008 WL 2844652 (S.D.Ohio, July 22, 2008) (J. Rice) (Plaintiffs' claims under Ohio common law dismissed as abrogated), *Stratford v. SmithKline Beecham Corp.*, Case No. 2:07–CV–00639, 2008 WL 2491965, 2008 U.S. Dist. LEXIS 84826 (June 17, 2008, S.D. Ohio) (OPLA has preempted the warranty of merchantability and warranty of fitness for a particular purpose). In Defendants' view, therefore, Plaintiffs' claims for breach of warranty, negligence, fraud and negligent representation should all be dismissed as a matter of law because they are abrogated by the OPLA (*Id.*).

At the hearing, The Court expressed that although it had considered Defendant's arguments about abrogation, it seemed the statute makes clear that the common law was not abrogated to the extent Defendant argues. Ohio Revised Code § 2307.72(C) makes it clear that a claim for compensatory damages for economic damages, other than a product liability claim, is not subject to the OPLA, but may occur under the common law of Ohio or other applicable sections of the Revised Code. Plaintiffs' Amended Complaint does not specify on its face, claim-by-claim, which statutory sections upon which they base their claims. The Court finds well-taken, however, the argument that Plaintiffs' warranty claims can find a basis grounded in the Uniform Commercial Code and therefore are not claims abrograted by the OPLA. Ohio Revised Code § 1302.26, *Miles*, 612 F.Supp.2d at 922–25 (N.D.Ohio 2009). Similarly, the Court finds actions for fraud and negligent misrepresentation as outside the scope of the OPLA's abrogation, as neither fit neat-

ly into the definition of a "common law product liability claim." The Court finds persuasive Plaintiffs' argument that Defendants' reliance on *Deacon v. Apotex Corp.*, Case No. 3:07–CV–00322, 2008 WL 2844652 (S.D.Ohio, July 22, 2008), is not on point, as the claims dismissed in such case were common law claims. *Deacon v. Apotex Corp.*, Case No. 3:07–CV–00322, 2008 WL 2844652 (S.D.Ohio, July 22, 2008).

■ The Court, however, finds instructive the reasoning in *Stratford v. SmithKline Beecham Corp.*, where the Court found a claim for negligence preempted by the OPLA, because the actionable conduct that formed the basis for such claim was the same conduct the OPLA defined as giving rise to a products liability claim. Case No. 2:07–CV–00639, 2008 WL 2491965, *4–5, 2008 U.S. Dist. LEXIS 84826, *13 (June 17, 2008, S.D. Ohio). Here, Plaintiffs' negligence claim is grounded in Defendant's action in the "design, production, marketing, and sale" of Q–Tel products, actions that fall within the OPLA's definition of a product liability claim. Ohio Rev.Code § 2307.71(A)(13)(a) ("Product Liability claim" arises from "the design, formulation, therefore, Plaintiffs are dressing up an OPLA claim as a negligence claim, which really amounts to a "common law products liability claim.") As such, the Court finds Defendant's argument as to Count 10, for negligence, correct, and grants summary judgment as to such claim.

## C. Economic Loss Doctrine

Defendant argued at the hearing that Plaintiffs have suffered no recoverable damages because the gel and the coupler are the same product and because the insurance company has paid out for automobile claims and is thus the real-party-in-interest. Defendant further argued that Plaintiffs have no damages because the life span of the couplers, which still work, is five years, and some have been functioning in excess of six years. Plaintiffs responded that the economic loss doctrine only applies where the product itself is damaged and is inapplicable where the product damages something else. Here, Plaintiffs argue, there is no question the product has resulted in damages to cars and has landed on Duke Energy Corporation power lines. Duke, Plaintiffs argue, has specifically told Plaintiffs "you have to get Q-gel off our lines." Plaintiffs say, "We're talking about millions of dollars of damages that have occurred because of that directive." Moreover, Plaintiffs argued, "we have a relationship with the insurance company . . . I think we do have a subrogation with them."

As Defendant explains in its briefing, the economic loss doctrine precludes recovery in tort for damages of purely economic damages: a plaintiff must have some sort of contractual relationship with a defendant to recover such damages and cannot recover in negligence where there is lack of physical harm to persons and tangible things (doc. 46). Plaintiffs responded that the doctrine is inapplicable here because two exceptions under Ohio law apply: 1) the doctrine does not apply when a party suffers property damage, and 2) the doctrine does not apply to negligent misrepresentation claims (doc. 62). Defendant replies, as it did at the hearing, that the Q-gel and the couplers are one and the same property, and reason therefore Plaintiffs are seeking to recover the cost of removing and replacing the couplers, pure economic damages (doc. 65).

■ The Court does not find well-taken Defendant's argument that Plaintiffs have suffered no damages beyond those to the actual product itself. The evidence shows not damage to the gel, or even the couplers and the gel together, but rather widespread damage to cars across the city,

and damages resulting to Plaintiffs as a result of Duke Energy's directive to get the gel off their lines. The Court further rejects Defendant's argument that Plaintiffs have suffered no damages as the insurance company has paid out claims for vehicle damage. Although the insurance company could technically become a subrogee and assert claims against Defendant for amounts that it has paid out, such fact does not bar Plaintiffs, in the shoes of whom the insurance company would be stepping to pursue such claims, from establishing physical harm to property in the context of resisting the application of the economic loss doctrine. In conclusion, the Court rejects Defendant's arguments that Plaintiffs fail to assert viable claims of damages beyond the product itself, and rejects Defendant's arguments premised on the economic loss doctrine.

### D. Statute of Limitations

In its motion, Defendant argues the couplers began leaking in late 2004, and Plaintiffs filed their original Complaint on July 17, 2007 (doc. 46). Defendant argues that under the applicable two-year statute of limitations in O.R.C. § 2305.10(A), Plaintiffs' actions are barred, as their causes of action accrued prior to July 17, 2005 but they failed to file their claims until after such date (*Id.*).

Plaintiffs respond that Defendant's argument fails as the "discovery rule" applies to this case, as Plaintiffs did not discover the failure of the Q–Tel product until August 2005 (doc. 62). In the alternative, Plaintiffs argue that Defendant admits the causes of action accrued in August 2005, and that the statute of limitations was tolled by Defendant's fraudulent concealment (*Id.*).

Defendant replies that there is no genuine issue of fact, based on deposition testimony, that the couplers began leaking in late 2004 and early 2005, such that Plaintiffs' claims are time-barred (doc. 65). Should Plaintiffs rely on the doctrine of fraudulent concealment to avoid the statute of limitations, Defendant argues Plaintiffs must plead with particularity 1) wrongful concealment of their actions by the Defendant, 2) failure of the Plaintiffs to discover the operative facts that are the basis of their cause of action within the limitations period, and 3) Plaintiffs' due diligence until discovery of the facts (*Id. citing Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir.1975)). Defendant argues the facts of this case do not support a claim of fraudulent concealment, but rather that Defendant offered Plaintiffs the theory that Plaintiffs improperly mixed the gel product, not so as to fraudulently conceal the cause of the leaking gel, but because such theory remains a viable cause of the leaking (*Id.*).

The Court need not reach the parties' arguments regarding fraudulent concealment, as it finds Plaintiffs' invocation of the discovery rule correct. The Court rejects Defendant's theory that Plaintiffs' action is barred by the statute of limitations. *Collins v. Sotka*, 692 N.E.2d 581, 584, 81 Ohio St.3d 506, 509 (1998) (collecting and citing cases, finding "statutes of limitations should not bar claimants before they have a reasonable basis for believing they have a claim.").

### E. Breach of Express and Implied Warranty: Third–Party Beneficiary

Defendant argues in its motion that it is entitled to summary judgment on Plaintiffs' claim in Count 4 because it is not a cause of action under the law (doc. 46). Plaintiffs appear to address this question in their discussion of the issue of privity, where they cite to *Bobb Forest Prods. Inc. v. Morbark Indus. Inc.*, 151 Ohio App.3d 63, 783 N.E.2d 560 (Ohio Ct.App., 2002), in

which an Ohio court found viable breach of warranty claims by a third-party beneficiary (doc. 62). However, Plaintiffs also concede[2] that although they denominated their third-party beneficiary status as a "claim," strictly speaking it is a doctrine used to establish privity, but Ohio cases have not always been explicitly clear about the distinction (*Id.*). Accordingly, Plaintiffs indicate, so as to alert Defendants as to the nature of their claims, they denominated their reliance on the doctrine as a "claim" (*Id.*).

The Court finds no genuine question that Plaintiffs have a valid basis for establishing privity with Defendant through the third-party beneficiary doctrine. As such, although technically Defendant is probably correct, the Court finds Plaintiffs' position well-taken that Ohio cases have not been explicitly clear, and finds well-taken that their Complaint put Defendant on notice as to the nature of their claims. Out of an abundance of caution, the Court declines to grant summary judgment as to Count 4, so as to ensure there is no question concerning the application of the doctrine here.

**F. Disclaimer**

■ Defendant's next argument is that Plaintiffs' breach of warranty claims are barred because Defendant disclaimed any warranties, as its specification sheet states "all information is given without warranty or guarantee" (doc. 46). Plaintiffs respond that several genuine issues of fact remain as to whether Defendant effectively disclaimed all warranties (doc. 62). Specifically, Plaintiffs argue facts remain as to whether Plaintiffs ever received the specification sheet containing the disclaimer, whether the disclaimer was conspicuous, and whether the disclaimer effectively disclaimed the implied warranty of merchantability and Defendant's express warranties (*Id.*). Defendant replies that there is no

genuine issue that Plaintiffs received the disclaimer, and argue it is conspicuous on its face (doc. 65).

The Court finds Plaintiffs' argument well-taken that the record neither establishes they received a disclaimer, nor that the disclaimer Defendant has proffered amounts to a conspicuous disclaimer that a reasonable person ought to have noticed. Ohio Rev.Code § 1301.01. The Court further concludes that Defendant's purported disclaimer that "all information is given without warranty or guarantee" did not effectively disclaim the implied warranty of merchantability, as the disclaimer does not mention merchantability. Ohio Rev. Code § 1302.29(B). Finally, questions of fact exist as to whether Defendant's disclaimer is reasonable vis a vis its express warranties. As such, the Court rejects Defendant's motion for summary judgment as to Plaintiffs' warranty claims.

**G. Supplier Liability (Count 9) and Negligent Misrepresentation (Count 12).**

■ Defendant claims it is entitled to summary judgment on Plaintiffs' claim for Supplier Liability, because such claim is barred under the OPLA, Ohio Rev.Code § 2307.71(A)(15)(b)(1), which defines a "supplier" to exclude "manufacturers" (doc. 46). Although the Court sees no record evidence establishing definitively that Defendant is the manufacturer of the product, Defendant states as much in its motion. While not contesting Defendant's reading of the OPLA, Plaintiffs respond that whether Defendant is a manufacturer or a supplier is a question of fact for the jury to decide at trial. The Court agrees. Such question presumably would be easily resolved by the jury with the proffer of evidence. As such, the Court withholds judgment on this issue.

**2.** In their twentieth footnote, page 27 of their Response in Opposition.

Defendant also argues (as it did above in the economic loss doctrine section) that Plaintiffs' negligent misrepresentation claims fail for lack of a special relationship between the parties (doc. 65, *citing Doe v. SexSearch.com,* 551 F.3d 412 (6th Cir. 2008). However, the Court finds well-taken Plaintiffs' position that Defendant misreads the formal elements required for a negligent misrepresentation claim, which are simply that 1) the Defendant supplied false information for the guidance of the Plaintiff in its business transactions; 2) the Plaintiff was justified in relying on the information; and 3) the Defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information (doc. 62, *citing National Mulch and Seed, Inc. v. Rexius Forest By–Products Inc.,* 2007 WL 894833, at *9 (S.D.Ohio 2007). The Court finds that a reasonable jury could find record evidence supporting Plaintiffs' claims for negligent representation. As such, the Court denies Defendant's motion as to such claim.

### H. Defective Manufacture or Formulation (Count 5)

 Defendant next argues it is entitled to summary judgment on Plaintiffs' claim for strict liability for defective manufacture or formulation (doc. 46). Under O.R.C. § 2307.74, Defendant argues Plaintiffs must establish its gel was defective and the defect was a proximate cause for the harm for which Plaintiffs seek to recover *(Id.).* In Defendant's view, the gel did not deviate in any material way from the design specifications, formula, or performance standards, and Plaintiffs' experts offered no testimony that the gel was defective in manufacture *(Id.).* Plaintiffs respond that Defendant's specification sheets for the gel represent that the product is a "superior, non urethane, reenterable encapsulant" that forms a "moisture-proof encapsulation" *(Id.).* Moreover, indicate Plaintiffs, the sheets represent that the gel passed standardized test methods and met the "Bellcore" standard [3] *(Id.).* Despite such representations, Plaintiffs contend, the gel is hardly moisture-proof as it disintegrates in the presence of heat and humidity *(Id.).* Defendant replies that the specification sheets were merely a "data sheet and cover page" marketing materials that do not constitute the chemical component formula of the product, which is a trade secret (doc. 65). Defendant reiterates that no expert offers an opinion that the gel in this case deviated from the formula *(Id.).*

The Court finds that a reasonable jury could conclude that the product sold by Defendant was defective in manufacture or formulation. A jury could view the data sheets as representing the gel would form a moisture-proof encapsulation, in contrast to the images of dripping gel that Plaintiffs displayed at the hearing, and find in Plaintiffs' favor on this claim.

### I. Damages

Defendant next argues that Plaintiffs' damages are speculative because Plaintiffs have only incurred some $633,023 of their claimed $4,812,895 in damages (doc. 46). Defendant argues Plaintiffs may never have to replace the balance of the couplers, and allowing them to recover future speculative damages would provide them a windfall *(Id.).* Plaintiffs respond that Defendant does not allege the amounts it claims

---

**3.** Plaintiffs explained at the hearing that the Bellcore industry standards for hydrolytic stability tests how well a compound can resist decomposition in the presence of heat and humidity. It involves boiling a sample of the tested substance in water for seven days, after which time the substance cannot disintegrate, noticeably swell or revert to a liquid, nor can it increase in weight by 5% or decrease by 10%. Should the substance meet these criteria it satisfies the Bellcore 354 criteria.

are unsupported or improper, nor that Duke Energy has required them to remove leaking couplers from its network (doc. 62). Plaintiffs contend they have incurred the injury and damages, although they might not have yet paid the full amount to replace the couplers they seek in damages (*Id.*). The issue of whether their damages are speculative, argue Plaintiffs, is a question of fact for the jury, and is not appropriate for a summary judgment motion (*Id.*). In reply, Defendant argues Plaintiffs rely on hearsay for the assertion that Duke Energy is requiring replacement of the couplers (doc. 65). Moreover, Defendant argues Plaintiffs in no way address the argument that a large number of couplers are no longer required because there are no customers, and because Duke may not pursue monitoring technology (*Id.*).

The Court agrees with Plaintiffs' position that in the Southern District of Ohio, "the issue of whether damages are reasonably certain is generally a question of fact for the jury." *Miami Packaging, Inc. v. Processing Systems, Inc.*, 792 F.Supp. 560, 566 (S.D.Ohio 1991). The Court further finds the proposition that Duke is requiring Plaintiffs to remove the gel from the network properly supported by the Declaration of Rick Walsh, which includes two letters Duke sent to him on the subject. The jury will be able to weigh the facts and Defendant's various arguments in arriving at a damages award, if any.

## J. Punitive Damages

Defendant argues it is entitled to summary judgment on Count 13, Plaintiffs' claims for punitive damages, as no such claims exists under Ohio law (doc. 46). Defendant argues punitive damages are merely a remedy and are not an independent cause of action (*Id.*). Plaintiffs respond that although punitive damages are a type of damages and not necessarily technically a "claim," they denominated them as such so as to ensure Defendant had full notice of the nature of the relief Plaintiffs are seeking (doc. 62).

The Court normally does not address the issue of punitive damages at the stage of summary judgment, allowing the question to be presented to the jury, as appropriate. Accordingly, the Court sees no need to rule on the question of punitive damages at this time, and declines to grant Defendant summary judgment on the issue.

## IV. Plaintiffs' Motion for Partial Summary Judgment

The Court also heard the parties at the July 16, 2009 hearing concerning Plaintiffs' Motion for Partial Summary Judgment (doc. 52). Prior to the analysis of such arguments, however, the Court finds it appropriate to address Plaintiffs' Motion to Strike (doc. 69) as it involves evidence relevant to the Court's consideration of the dispositive motion.

### A. The Motion to Strike

In their Motion to Strike, Plaintiffs complain that Defendant continually failed to produce testing materials and documents during discovery, despite Plaintiffs' repeated requests, and so the admission of such "evidence" at this point is "nothing more than a fraud on the parties and the Court" (doc. 69). Specifically, Plaintiffs seek to strike the affidavit of Sam Ghaly, Chemque's president, who averred that Q-gel takes several months to cure at room temperature, that his company performed Bellcore 354 hydrolytic stability on "fully-cured" Q-gel, and it all passed the test. Plaintiffs argue that Defendant's introduction of evidence after the close of discovery is an improper violation of the Court's scheduling order, and that the proffer of

such evidence is irrelevant and therefore inadmissible (doc. 69).

Defendant responds that Federal Rule of Civil Procedure 56(e)(2) specifically requires a party opposing a motion for summary judgment to, by affidavits, set out specific facts showing an issue for trial (doc. 69). Defendant further responds that Ghaly's affidavit is relevant to the question of whether cured Q–Gel passes the hydrolytic stability test (*Id.*). Defendant argues Plaintiffs premise their motion on their allegation that the product fails such test, so the affidavit is clearly relevant (*Id.*). The Court agrees and denies Plaintiffs' Motion to Strike.

### B. The Motion for Summary Judgment

Plaintiffs move for summary judgment on their eighth claim for relief, for strict liability for failure to conform to a representation (doc. 52). Plaintiffs rely on the specification sheets, which they attach to their motion as Exhibits F and G, that explain (as noted above in Section H in the argument regarding defective manufacture) the properties of the Q–Tel gel, including that it is a "superior, non urethane, reenterable encapsulant" that forms a "moisture-proof encapsulation," and that it met the Bellcore standard (*Id.*). Plaintiffs argue they relied on Defendant's representations to their detriment when the gel failed, and Plaintiffs' experts have opined that the gel failed to meet the Bellcore standard (*Id.*). In fact, Plaintiffs' expert Dr. Lori Streit, opined that Defendant never performed the Bellcore hydrolic stability test on the final formulation of the Q–Tel gel that it marketed and sold as up to such standard (*Id.*). Under these circumstances, they argue, they are entitled to summary judgment (*Id.*).

Defendant responds, relying on its disclaimer on the specification sheets that "all information is given without warranty or guarantee" and indicating that "it is imperative that you test our products … to determine to your own satisfaction whether they are suitable for your intended uses and applications" (doc. 59). Defendant further notes that its cover page to the "Q–Gel 2031 data sheet" explicitly refers to "encapsulation for buried cable splices, consistent with its position that the product has historically been used for underground applications (*Id.*). Defendant critiques the opinions of Plaintiffs' experts as based on defective methodology, and proffers its own expert, Attila Dima, who opined the leaking gel could have been caused by incompatibility between the gel and other components in the coupler and/or contamination in the couplers (*Id.*). Finally, as already referenced above, Defendant proffers the affidavit by Sam Ghaly, Defendant's president, stating that the gel must cure for several months at room temperature before hydrolytic stability testing (*Id.*). The balance of Defendant's response appears to reiterate arguments raised in its own motion for summary judgment.

In Plaintiffs' Reply, Plaintiffs argue that even should the Court admit the affidavit of Sam Ghaly, they still prevail because there is no dispute that Defendant represented its product met the Bellcore standard when it never tested the final formulation it sold to Plaintiffs (doc. 70). Moreover, Plaintiffs argue there is no evidence in the record that Defendant ever informed them that the product would take several months to cure (*Id.*).

■ Having reviewed this matter, the Court finds, taking all inferences in favor of the non-moving party, that there are sufficient factual disputes in the record such that Defendant escapes summary judgment. To establish a claim for failure to conform to a representation, Plaintiffs must prove that a product is defective,

which the statute defines as "not conform[ing], when it left control of its manufacturer, to a representation made by that manufacturer." Ohio Rev.Code. § 2307.77. Here, Defendant proffers evidence that the product was represented as one used for underground applications, where the environment would presumably be less susceptible to wide temperature variations. Moreover, Defendant proffers evidence that its "properly cured" product met the Bellcore standard, and expert testimony that the product's decomposition might have been attributed to intervening factors. These are all factual questions appropriate for a jury's determination. Accordingly, the Court denies Plaintiffs' motion for partial summary judgment as to the question of failure to conform to a representation.

## V. Conclusion

The Court was impressed by the arguments and the professionalism of counsel, who very ably served their clients at the hearing on these motions. The Court congratulates counsel on their good work. However, the Court finds too many facts at dispute in this matter, such that summary judgment is inappropriate on all the pending questions save one. The Court finds well-taken Defendant's challenge to Count 10 for Negligence, which the Court finds abrogated by the OPLA, as such claim really amounts to a common law product liability claim.

Accordingly, the Court GRANTS IN PART Defendant's Motion for Summary Judgment (doc. 46) as to Count 10, Plaintiffs' Claim for Negligence, but DENIES the balance of Defendant's Motion for Summary Judgment as to all remaining claims (*Id.*); the Court DENIES Plaintiffs' Motion to Strike (doc. 69); and DENIES Plaintiffs' Motion for Partial Summary Judgment (doc. 52). The Court further schedules this matter for final pretrial conference at 10:00 A.M. on October 15, 2009,

and for five-day jury trial to commence November 17, 2009.

SO ORDERED.